## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Valerie Jones,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Civil Action No. 05-1187 (RMU)** |
| | ) |
| **University of the District of Columbia** | ) |
| **Board of Trustees,** | ) |
| | ) |
| **Defendants.** | ) |
| _____ | ) |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The University of the District of Columbia Board of Trustees ("UDC"), by and through undersigned counsel, hereby moves this Court to grant summary judgment in its favor. In sum, this Court should grant the UDC's Motion for the following reasons: 1) the plaintiff failed to exhaust her administrative remedies for any allegation of discrimination occurring outside of the time period of July 2003 to October 2003; 2) the plaintiff is not disabled; 3) the plaintiff failed to give notice to any UDC official of her disability in July 2003 or October 2003 nor has she *to date* provided to the UDC any medical documentation documenting any disability or restrictions or limitations on her ability to return to work; and 4) the plaintiff could not perform essential functions of the UDC police officer position with or without reasonable accommodations.

A Memorandum of Points and Authorities, along with a proposed Order, are attached hereto. Pursuant to Local Rule 7, undersigned counsel is not required to obtain plaintiff's consent to the instant dispositive motion.

Respectfully submitted,

LINDA SINGER
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


_____/s/_____
PHILLIP A. LATTIMORE, III [422968]
Section Chief
General Litigation Section III


_____/s/_____
DANA K. DELORENZO [468306]
Assistant Attorney General
Sixth Floor South
441 4th Street, N.W.
Washington, D.C. 20001
(202) 724-6515
(202) 727-3625 (fax)
E-Mail: dana.delorenzo@dc.gov

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Valerie Jones,** | ) |
| | ) |
|       **Plaintiff,** | ) |
| | ) |
| **v.** | )      **Civil Action No. 05-1187 (RMU)** |
| | ) |
| **University of the District of Columbia** | ) |
|       **Board of Trustees,** | ) |
| | ) |
|       **Defendants.** | ) |
| _____ | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The University of the District of Columbia Board of Trustees ("UDC"), by and through undersigned counsel, hereby moves this Court to grant summary judgment in its favor on the plaintiff's Amended Complaint and submits this Memorandum of points and authorities in support of its Motion for Summary Judgment.

*Factual Background*

*A. Plaintiff's Employment at the University of the District of Columbia ("UDC").*

Ms. Jones was hired in 1988 at UDC as a police officer. (Jones Deposition, attached hereto as Exhibit A, at 11-12.) This is a non-management position that is generally a part of the union. The rights and responsibilities of UDC police officers are set forth in the Collective Bargaining Agreement ("CBA"), which Ms. Jones received after she was hired by the UDC. (Exhibit A at 58.) Notably, paragraphs 7.9 and 7.10 of the Agreement, which are attached hereto as Exhibit B, require an employee to submit medical documentation to the university when requesting an accommodation for health

reasons. (Exhibit A at 59.)[1]

The police officer position is physically demanding. "Officers have to patrol all area aspect[s] of the campus," which is comprised of "25 acres," including "11 buildings," "three parking garages" and "five surface parking lots." (Robinson Deposition, attached hereto as Exhibit C, at 49-50.) Police officers patrol interior and exterior areas of all campus buildings, they patrol the entire campus, direct traffic, issue tickets, respond to incident reports and they work communications and other special events (*e.g.*, dances and registration). (Exhibit A at 12-13, 17.)

The UDC has identified the essential functions of the police officer position through the two position descriptions relevant to the time period of July 2003 through October 2003. The first position description is dated December 19, 1995 and the second position description, which is signed by Mr. Robinson, is dated September 15, 2003. Both are attached hereto as Exhibit D. The 1995 position description includes the following duties, knowledge and physical demands:

Duties

- Conducts periodic patrols and inspections of buildings to prevent unauthorized removal of University property and unauthorized access to

---

[1] Paragraphs 7.9 and 7.10 read in full (emphasis added):

7.9 Physical Limitations

    The Employer agrees to take measures to accommodate, to the extent possible, appropriately documented physical limitations or disabilities. Employees who desire such accommodations *shall be responsible for informing the Office of University Compliance of any medically sanctioned limitations or disabilities which may affect their work performance or their physical well-bring.*

7.10 Reassignment Due to Health Reasons

    The University agrees to give consideration to an employee's written request for detail or reassignment for health reasons. *Such requests shall be forwarded to the Office of Personnel Management, with medical documentation.* Specific medical information will be held in confidence. The University's decision on the request will be communicated to the employee as soon as possible.

restricted room and areas; … to check and secure exterior building entrances; to detect and apprehend unauthorized personnel; …

- Takes immediate steps to apprehend and arrest those who are responsible for the incident and to protect all occupants within the confines of the facility from physical harm.

Knowledge Required by the Position

- Demonstrated ability to use firearms in a safe manner, and skill in their use.

- Ability to meet and deal with a wide range of persons in stress situations.

- Ability to exercise arrest authority and work under hazardous conditions.

Physical Demands

Walking, climbing, driving, running, etc.

(Exhibit D, 1995 position description.)

The 2003 position description includes the following duties, knowledge and physical demands:

Duties

- Preserves and maintains law and order; observes, reports, and responds to illegal and unauthorized activity occurring on University owned and controlled premises through enforcement of University policies, procedures and protocols, and District of Columbia Official Code.

- Responds to various alarms associated with the protection of persons and properties.

- Conducts preliminary and follow up investigations; responds to, and investigates, unusual, suspicious, criminal, and non-criminal activity…

Knowledge Required by the Position

- Decision making skills: demonstrate sound and prudent judgment, particularly under stressful conditions.

- Proficiency in the care and use of firearms.

Physical Demands

- Standing for extended periods, walking, running, bending, climbing (stairs), driving, and other flexibility associated with affecting police related actions.

(Exhibit D, 2003 position description.)

As evidenced from the two relevant position descriptions, police officers provide safety protection to the University community. They provide protection services to staff, students and individuals attending the UDC. (Exhibit A at 18.) They apprehend and arrest individuals who may have committed crimes on the campus. (Exhibit A at 18.) In fact, for approximately eleven years, the plaintiff carried a firearm as part of her responsibility as a police officer for the UDC. (Exhibit A at 19.) Also at times, Ms. Jones operated a golf cart in order to conduct surveillance of University grounds. (Exhibit A at 83.)

B.    *Plaintiff's Workplace Injuries.*

Ms. Jones has a long-standing history of alleged work-related injuries. On December 17, 1999, Ms. Jones claims that she was assaulted by another employee while on duty. (Exhibit A at 21.) As a result of the alleged assault, Ms. Jones suffered injuries to her mouth, jaw, face, right shoulder, "whole back area" and ankle. (Exhibit A at 27.) She has taken percocet off and on to alleviate the pain. (Exhibit A at 175.) In addition, she began to suffer anxiety attacks.[2] (Exhibit

---

[2] The frequency of the anxiety attacks varied from "two/three times out of the week" to a "week or two" without an attack. (Exhibit A at 334.) Ms. Jones has "no idea" what triggers her attacks because "they come on when [she's] calm or if [she] is upset…" (Exhibit A at 334-335.) Ms. Jones described the symptoms of an anxiety attack in this manner:

> …[M]y heart beats very, very fast, like it's, like palpitating. And I feel real, real, real hot – very extremely hot, like I'm on fire. And I feel frightened; I feel like it's the end of the world, like the world is coming to an end, or like I'm about to die. I feel real jittery, nervous, I feel faint, and I just feel real sick in my stomach, and my heart is just throbbing real fast, and head hurt. And just real jittery, nervous, anxious…

(Exhibit A at 335-36.) To calm these attacks, Ms. Jones is currently taking generic Zoloft. (Exhibit A at 336.)

A at 332.)  She was placed on worker's compensation from December 1999 to October 2000 --
approximately 10 months.

Ms. Jones returned to work in October 2000 where she worked "communications on
some days and then on some days [she] did patrolling in a light-duty status."  (Exhibit A at 45-
46.)  Ms. Jones described "light duty" as: "limited patrolling, limited walking, so some days, I
would patrol for a few hours and then at some point the supervisor would let me come back to
communications…" (Exhibit A at 46.)

In April 2001, some 6 months after returning to work, Ms. Jones suffered an anxiety
attack in a UDC elevator when she came face to face with the individual who allegedly assaulted
her in 1999.  (Exhibit A at 69.)  Ms. Jones "began to have difficulty breathing … and [her] heart
was … pounding, beating very fast and [she] felt frightened."  (Exhibit A at 69-70.)  Ms. Jones
"passed out" and "fell against a hard object or something and it hit [her] back." (Exhibit A at 71-
72.)  She was then transported to the hospital.  (Exhibit A at 71-72.)  As a result of this incident,
she sustained injuries to her "back and shoulder."  (Exhibit A at 73.)  Although Ms. Jones does
not remember if she went out on worker's compensation again at that time, she may have
returned to work in approximately summer 2001.  (Exhibit A at 74.)

C.     *The Alleged Disability*

The allegations in this case stem from an on-the-job injury that Ms. Jones allegedly
suffered on November 14, 2002, when she fell face-forward over a concrete step on the roof of a
UDC building.  (Exhibit A at 98-99.)  As a result of this incident, Ms. Jones claims to have
suffered injuries to her back, shoulder, knees, elbows and right hip.  (Exhibit A at 105.)  Ms.
Jones was prescribed pain medication, used pain patches and received cortisone injections but
the "pain never went away."  (Exhibit A at 108.)  Ms. Jones also attended physical therapy for "a

few months." (Exhibit A at 108-09.) From November 2002 to January 2003, Ms. Jones continued to suffer anxiety attacks. (Exhibit A at 333-34.) In fact, she alleges to have suffered an anxiety attack as the result of a telephone conversation with Lt. Morton, her UDC supervisor, about his failure to submit paperwork so she could get her worker's compensation payments. (Exhibit A at 333.)

On February 24, 2003, Ms. Jones sent a Memorandum to then-Captain Morton requesting 240 hours of advance leave. (February 24, 2003 Memorandum attached as Exhibit E.) A copy of this letter was sent to Hattie Rogers, who is an HR "benefits person." (Exhibit A at 118-19.) On February 27, 2003, some three months after her workplace injury, Ms. Jones was scheduled to undergo gastric bypass surgery, a procedure that appears to be unrelated to any of her job-related injuries.

On March 14, 2003, then-Captain Morton wrote a memorandum in response to a call he received from Yvonne Chandler, a UDC HR benefits employee who inquired whether there were any light duty positions available for Ms. Jones. (Morton Deposition, attached hereto as Exhibit F, at 11.) The Memorandum, attached hereto as Exhibit G, reads: "This memorandum is to inform you that Officer Valerie Jones is requesting light duty from the Office of University Police. At this time we do not have light duty assignment available for Ms. Jones." Ms. Jones does not recall speaking to Ms. Rogers or Ms. Chandler before July 2003. (Exhibit A at 119.)

On July 2, 2003, some eight months after the plaintiff went out on worker's compensation, Ms. Jones' doctor, Phillip H. Omohundro, M.D., wrote her a note and released her to "light duty" with restrictions. (Exhibit H.) Ms. Jones was restricted to only walk and stand for 2 hours out of an 8-hour day. (Exhibit H.) She was not allowed to lift or carry. (Exhibit H.) The July 2, 2003 doctor's note indicated that Ms. Jones should be re-evaluated in four weeks.

(Exhibit H.)  The plaintiff did *not* give any UDC official a copy of Dr. Omohundro's July 2, 2003 doctor's note.  (Exhibit A at 145-46.)  (*See* footnote 1, *supra*.)

Although Ms. Jones testified that in July 2003, she was able to conduct periodic inspections and patrols, patrol some traffic, and write some tickets and incident reports of these tasks for 2 hours, she conceded that she was not physically able to apprehend suspects or perform other patrol duties during her entire, 8-hour shift.  (Exhibit A at 161-62, 164-65.)  Ms. Jones said that if she had to run after a fleeing suspect, she would not "get too far."  (Exhibit A at 81.)  In July 2003, Ms. Jones did not drive because she was on medication that said "do not operate machinery."  (Exhibit A at 177.)  Even though the police officer position required her to be able to care for and use a firearm, Ms. Jones has not carried her firearm since December 1999 because of her injury.  (Exhibit A at 19; 38-39.)[3]

In the same month, Ms. Jones spoke to Lt. Glenn Adams, Lt. Morton, and finally, Mr. Robinson, the Vice President of the Department of Public Safety and Emergency Services.  She informed them that she "was released from [her] doctor to come back to work in a light duty status, and that [she] had … documents from [her] doctor."  (Exhibit A at 124.)  According to Ms. Jones, Lt. Morton directed her to contact Mr. Robinson because "a letter had come out in reference to no more light duty being available for the department."  (Exhibit A at 125.)[4]  Mr. Morton has no recollection of any July 2003 conversation with the plaintiff.  (Exhibit F at 10-11.)

Even though Ms. Jones alleges that Mr. Robinson informed her that "there was no light duty available," Mr. Robinson testified under oath that he informed the plaintiff in July 2003 that

---

[3] Notably, Ms. Jones testified that, due to the injury she sustained in December 1999, the range instructor informed her "that he could not allow [her] to come on the range while [she] was in that condition.  He said that [she] would have to be at full capacity and [she] couldn't be on any type, you know, on medication or anything."  (Exhibit A at 39.)

"she should … bring me some doctor's certification to let me know her limitations and so forth."
(Exhibit A at 133; Exhibit C at 6.)  This directive is consistent with the requirements of the
Collective Bargaining Agreement.  *See* footnote 1, *supra.*  According to Mr. Robinson, Ms.
Jones did not tell him about her restrictions.  (Exhibit C at 6-7.)  In addition, Mr. Robinson also
asked Ms. Jones if she was "on any medications."  (Exhibit A at 133.)  In response, Ms. Jones
told Mr. Robinson that she was on medication "for pain, for spasms" and that some of the
medications that she was taking made her "groggy" and "unbalanced." (Exhibit A at 133, 135;
Exhibit C at 7.)  During this conversation, Mr. Robinson allegedly informed Ms. Jones, a police
officer whose position required her to carry a firearm, that she "would be a threat to the
university and to the students because of [her] condition..."  (Exhibit A at 134.)  Mr. Robinson
did not have any further conversations with Ms. Jones about coming back to work at UDC.
(Exhibit C at 7.)

After her July 2003 telephone conversations, Ms. Jones conceded that she never produced
Dr. Omohundro's July 2, 2003 note or any other medical documentation to any UDC official.  In
her deposition, the following colloquy occurred between the plaintiff and the UDC counsel:

> Q     … Did you mail in any medical documentation in July 2003 to Mr.
>       Morton, Mr. Robinson, Lt. Adams or any of your supervisors at UDC?
>
> A     No I did not.
>
> Q     In July of 2003, did you fax any medical documentation to Mr. Morton,
>       Mr. Robinson, Lt. Adams, Lt. Medley or any of your supervisors at the
>       University of the District of Columbia?
>
> A     Not to my recollection.
>
> Q     Did you hand-deliver to Mr. Morton, Mr. Robinson, Lt. Adams, Lt.
>       Medley or any of your supervisors at UDC any medical documentation
>       from Dr. Omohundro?

---

[4] The letter appears to be the March 14, 2003 Memorandum.

A      No, not to my recollection.

Q      Did you arrange for anyone else on your behalf to bring to Lt. Morton, Mr. Robinson, Lt. Medley, Lt. Adams or any of your other supervisors at the university the medical documentation by Dr. Omohundro?

A      Not to my recollection.

(Exhibit A at 145-46.)  No other evidence has been produced in discovery that demonstrates that any UDC official had knowledge of the contents of Dr. Omohundro's July 2, 2003 note.

On July 24, 2003, Ms. Jones left a telephone message for a different doctor, Andrew Lee to request a "letter stating her medical conditions … to her job."  (Exhibit I.)  She also stated she was "having anxiety attacks" and requested "ativan."  (Exhibit I.)

No UDC official heard from Ms. Jones in August 2003 and September 2003.  Even though Mr. Morton does not recall the conversation, Ms. Jones asserts to have spoken to him in October 2003, almost one year after her injury.  (Exhibit A at 200.)  She told him "everything was still the same."  (Exhibit A at 200.)

In fact, in 2003, Ms. Jones was in pain "on a daily basis."  (Exhibit A at 167.)  The "severe" pain was in her "shoulder, from the neck down to the lower back, both knees [and] the right hip." (Exhibit A at 168.)  Sometimes, Ms. Jones would use a cane to get up and down from a sofa, bed or chair.  (Exhibit A at 188.)  When asked specifically about how she was limited from 2003 to now in her ability to walk, stand, bend or lift, Ms. Jones responded as follows:

A      I'll put it to you this way: When I attempted to do certain things such as bending, standing, walking, it would cause me to be in more pain, such as if I tried to bend down to pick something up, it would cause pain to the back area, and knees, and there has been occasions when I have attempted to bend down and I have actually fallen to the floor.

Q      Are there other ways that you're limited in walking and standing?

A      Explain.

Q       I mean, you gave me an example where bending, sometimes, you fall over.

A       Okay.  If I—sometimes if I walk to a certain point—I don't know how long, because like I said, I don't time it.  Sometime my knee—my left knee—both knees are hurt, but sometime the more I try to walk, the more pain I feel in my knees, mainly the left knee …

Q       As a result of the arthritis or the bursitis, do your knees ever give out? Does anything physically happen with your body separate from the pain that limits your ability to walk or stand or bend or lift?

A       Yes, there have been occasions when the left knee has given out and—for example, if I –when I have to go up steps, I try to support on the other leg because when I try to bend the left knee to go up steps, it's very painful. So I try to put all the weight on my right left when I go up and down steps. And when I'm reaching, I've – the majority of the time, I'm using my left hand so now recently I have been experiencing pain in my left shoulder.

(Exhibit A at 343-46.)

However, in 2003, Ms. Jones was able to "shower," "brush [her] teeth," "fix breakfast," "look at tv," "read the newspaper," (Exhibit A at 170-73.)  She would also participate in "physical therapy" approximately two or three times a week for about 30 minutes.  (Exhibit A at 174.)  She described physical therapy at that time as including "leg lifts," and "a variety of exercises," including attaching a device to her doorknob and pulling it.  (Exhibit A at 173-74.)  Also in July 2003, she would take walks with her husband.  (Exhibit A at 176-77.)

D.      *Ms. Jones' EEOC Charge of Discrimination.*

Ms. Jones filed an EEOC Charge of Discrimination on December 17, 2003.  (Exhibit J.)

It states, in pertinent part:

I. On November 14, 2002, I sustained a work-related injury.  I was on medical leave from November 14, 2002 until July 5, 2003, when I was released to return to work with restrictions.  When I attempted to return to work, the Respondent told me that they could not accommodate my work restrictions.  I was further told that in order for me to return to work, that my doctor had to release me to return to work at 100% with no restrictions.

On October 27, 2003, I again attempted to return to work and was told that I could

not return to work with restrictions.

II. RESPONDENT'S REASON FOR ADVERSE ACTIONS: Robert Robinson told me that the Respondent did not have any light duty work for me.

(Exhibit J.)[5] The plaintiff did not amend her EEOC Complaint. (Exhibit A at 121-22.)

E.    *Ms. Jones Never Attempted to Return to Work After Filing Her EEOC Charge.*

Ms. Jones never contacted Lt. Morton, Lt. Adams, Lt. Medley or Mr. Robinson in 2004 to come back to work:

Q    In 2004, did you ever make contact with Morton or Robinson or Medley or Adams at UDC to try and come back to work?

A    2004? Not to my recollection.

(Exhibit A at 199.)

On October 21, 2004, almost one year after she filed her EEOC complaint, Ms. Jones had surgery on her right shoulder. (Exhibit A at 208.) She remained out on worker's compensation until February 15, 2005, when Dr. Omohundro again released her to "light duty." (February 15, 2005 note attached hereto as Exhibit K; Exhibit A at 212-213.) Ms. Jones also never gave this doctor's note to any UDC official because she had "received … the 'Right to Sue' letter … and after that, [she] contacted a lawyer." (Exhibit A at 216-217.)[6] For these reasons, she said she "had no need to be in contact with UDC at that time." (Exhibit A at 216-217.)

F.    *Ms. Jones Never Provided Any UDC Official With Any Medical Documentation Relating to Her Limitations.*

Ms. Jones conceded that from July 2003, and up to the present, she never provided *any* medical documentation to any UDC official relating to any restrictions or limitations on her ability to return to work:

---

[5] Interestingly, during her deposition, the plaintiff testified that "to [her] recollection," she is not seeking relief for any incident occurring before July 5, 2003. (Exhibit A at 122.)

[6] The EEOC issued a Right to Sue Letter on March 22, 2005. (Amended Complaint.)

Q       Did you ever produce any documentation from a doctor about your
        restrictions on your duties at any time to the university from July 2003 to
        the present?

A       From 2003 until—

Q       From July 2003 to the present.

A       No, not to my recollection.

Q       Did you ask anyone to fax or mail or hand-deliver any documentation
        from any doctor about your restrictions from to the university from July
        2003 to the present?

A       Not to my recollection.

(Exhibit A at 152.)

G.      *UDC Accommodated Two UDC Police Officers Who Complied with Their Collective
        Bargaining Agreement By Providing UDC Officials With Notice of Their Limitations and
        Medical Documentation of Their Limitations.*

        Two UDC police officers received an accommodation for a medical need after the

relevant July 2003 - October 2003 time period which comprises Ms. Jones' EEOC Complaint.[7]

In each of these cases, the UDC employees presented medical documentation to the UDC

verifying the request for an accommodation and identifying injuries and/or restrictions.  In the

first case, police officer #1 presented a doctor's note to the UDC, dated December 18, 2003.

(Exhibit L.)  This note indicated that the officer "may return to restricted duty on 12/22/03."

(Exhibit L.)  The restrictions were limited to no excessive standing and/or walking for more than

one hour.  (Exhibit L)  Mr. Robinson issued a Memorandum, dated January 5, 2004, in which he

acknowledged receipt of the medical documentation and noted that it did not state the duration of

the restriction.  (Exhibit L)  Mr. Robinson stated that UDC would accommodate officer #1 for

two weeks.  (Exhibit L.)

In the second case, police officer # 2 presented a doctor's note to the UDC, dated February 19, 2004.  (Exhibit M.)  This note stated that the officer was released to light duty because of her right knee.  (Exhibit M.)  Mr. Robinson issued a Memorandum, dated February 23, 2004, in which he acknowledged receipt of the medical documentation and granted the request for light duty for two weeks.  (Exhibit M.)

H.    *The Federal Lawsuit.*

Ms. Jones filed the instant lawsuit on June 14, 2005 against the University of the District of Columbia Board of Trustees ("UDC") and the District of Columbia under the Americans with Disabilities Act and the Rehabilitation Act.[8]  In her amended complaint, Ms. Jones alleges that UDC discriminated against her based on her disability and failed to accommodate her in 2003 and 2004.  On November 17, 2005, the Court dismissed all claims against the District of Columbia because it has no control over the UDC, an independent agency governed by the Board of Trustees of the University of the District of Columbia.

## STANDARD OF REVIEW

Summary judgment must be granted if the moving party demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[7] For privacy reasons, undersigned counsel is not identifying the officers by name and will refer to them as officer #1 and officer #2.  In addition, the documentation related to these officers, attached hereto as Exhibits L and M, will have the officers' names and/or other identifying information redacted.

[8] Count I alleges disability discrimination under the ADA and Rehabilitation Act.  Count II alleges failure to accommodate under the ADA and the Rehabilitation Act.  Despite Count I, the District interprets this complaint as a failure to accommodate case.  Moreover, Count I appears to be duplicative of Count II.  Count I should be dismissed and/or summary judgment should be entered in the defendant's favor because the Amended Complaint does not allege that she suffered an adverse action nor does the evidence demonstrate that she was disabled or was otherwise qualified to be a police officer.  *See Duncan v. Wash. Metro. Area Transit Auth*., 240 F.3d 1110, 1114 (D.C. Cir. 2001) (internal citations omitted) ("Under the *McDonnell Douglas* framework an ADA plaintiff must prove that 'he had a disability within the meaning of the ADA, that he was 'qualified' for the position with or without a reasonable accommodation, and that he suffered an adverse employment action because of his disability.'"); Parts II(A) and (C), *infra.*  Thus, Ms. Jones has not satisfied the elements of a disability discrimination claim.

matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Although the movant has

the burden of demonstrating the absence of a genuine issue of material fact and that it is entitled

to judgment as a matter of law, the "moving party is not required to support its motion for

summary judgment with 'affidavits or other similar materials *negating* the opponent's claim.'"

*Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033 (D.C. Cir. 2003). At this point, then, "the

burden shifts to the non-movant to 'come forward with 'specific facts showing that there is a

genuine issue for trial.'" *Shaw v. District of Columbia*, 2006 U.S. Dist. LEXIS 26904 *14

(internal citations omitted).

    Fed. R. Civ. P. 56(e) reinforces that the plaintiff's response to the UDC's Motion "may

not rest upon the mere allegations or denials of the adverse party's pleading, but the [plaintiff's ]

response, by affidavits or as otherwise provided in the rule, must set forth specific facts showing

that there is a genuine issue for trial." To be genuine, the issue must be supported by evidence

sufficiently admissible that a reasonable trier of fact could find for the nonmoving party; to be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also Laningham v.

U.S. Navy,* 813 F.2d 1236, 1242-43 (D.C. Cir. 1987). Moreover, if the plaintiff "does not so

respond, summary judgment, if appropriate, shall be entered" against her. Fed. R. Civ. P. 56(e).

By this burden of proof, the plaintiff's claims against the UDC cannot stand. Therefore, the

Court should grant the instant Motion.

### *Argument*

**1. PLAINTIFF FAILED TO EXHAUST HER ADMINISTRATIVE REMEDIES REGARDING ANY ALLEGED DISCRIMINATION OUTSIDE THE PERIOD OF JULY 2003 AND OCTOBER 2003.**

    A discrimination suit "following an EEO complaint is limited to 'claims that are 'like or

reasonably related to the allegations of the charge and growing out of such allegations.'"  *See Broderick v. Donaldson*, 338 F. Supp. 2d 30, 39 (D.D.C. 2004) (internal citations omitted).[9]  The purpose for this requirement is to give the defendant employer notice of the claims against it.

In *Marshall v. Federal Express Corp.*, 130 F.3d 1095, (D.C. Cir. 1997)*,* the D.C. Circuit stated:

> Before bringing suit in federal court, ADA plaintiffs, like those under Title VII, must exhaust their administrative remedies by filing an EEOC charge and giving that agency a chance to act on it. 42 U.S.C. § 12117(a); *Park v. Howard University,* 315 U.S. App. D.C. 196, 71 F.3d 904, 907-09 (D.C. Cir. 1995). A vague or circumscribed EEOC charge will not satisfy the exhaustion requirement for claims it does not fairly embrace. "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Schnellbaecher v. Baskin Clothing Co.,* 887 F.2d 124, 127 (7th Cir. 1989). Naturally every detail of the eventual complaint need not be presaged in the EEOC filing, but the substance of an ADA claim, like that of a Title VII claim, must fall within the scope of "the administrative investigation that can reasonably be expected to follow the charge of discrimination."

*Id*. at 1098.  *See Marshall*, 130 F.3d at 1098 (concluding that plaintiff's wrongful termination claim failed because her EEOC charge did not mention the termination and she did not amend her original charge).  *See also Mianegaz v. Hyatt Corp.*, 319 F. Supp. 2d 13, 17 (D.D.C. 2004) (determining that the plaintiff's termination claim failed to exhaust administrative remedies because the "plaintiff's EEOC complaint refers only to his suspensions, making no mention of his termination … Of course, it would be curious if not clairvoyant for his EEOC complaint to actually reference his termination, given the fact that ... he filed it some ten months before his eventual discharge.").

---

[9] The UDC notes that courts routinely apply the same standards to evaluate Title VII claims as they do ADA claims, ADEA claims, and even ERISA claims."  *See Brown v. Brody,* 199 F.3d 446, 456 n. 10 (D.C. Cir. 1999).  Therefore, undersigned counsel may use case law interpreting these different statutes interchangeably.

In other words, an "EEOC charge and the complaint must, at a … minimum, describe the *same conduct* and implicate the *same individuals." Carroll v. England,* 321 F. Supp.2d 58, 65 (D.D.C. 2004*) citing, Kersting v. Wal-Mart Stores,* 250 F.3d 1109, 1119 (7th Cir. 2001); *Cheek v. W. & S. Life Ins. Co.,* 31 F.3d 497, 501 (7th Cir. 1994) (emphasis in original).

In this case, the plaintiff's EEOC complaint describes discrete events that form the basis for her discrimination complaint, namely telephone calls in July 2003 and October 2003, in which she allegedly requested a reasonable accommodation and was purportedly denied by UDC. Therefore, the UDC is only reasonably on notice of the discrete events described in the EEOC complaint for the period between July 2003 and October 2003.

Surprisingly, plaintiff's Amended Complaint in the instant case largely expanded the timeframe, alleging that in "2003 and 2004, [she] requested reasonable accommodations for her disabilities including working light duty." (Amended Complaint at ¶ 10.) Yet, when questioned about her requests for reasonable accommodations in discovery, she only identified the relevant time period as occurring between July 2003 and October 2003. The defendant proffered the following interrogatory:

> For each of your requests for accommodation from UDC, identify the person making the request, the person to whom the request was made, the date, nature and form of the request, and the specific accommodation(s) requested. Identify any relevant documentation in accordance with Instruction 7 and 8.

(Plaintiff's Supplemental Answers to Defendant's Interrogatory No. 6, attached hereto as Exhibit N.) The plaintiff's answer was:

> In or about July 2003, Plaintiff requested reasonable accommodations in the form of light duty from Lt. Morton and also from Mr. Robinson, and her physician requested light duty in a note dated July 2, 2003 … Each request was denied. I made my requests for light duty by telephone in July 2003 and October 2003 ...

(Exhibit N at No. 6.) This answer does not put the UDC on any notice of any claims arising after

the dates described in the EEOC complaint, namely July 2003 and October 2003.

In her deposition, Ms. Jones denied contacting Lt. Morton, Lt. Adams, Lt. Medley or Mr. Robinson in 2004 to come back to work:

> Q        In 2004, did you ever make contact with Morton or Robinson or Medley
>           or Adams at UDC to try and come back to work?
>
> A        2004? Not to my recollection.

(Exhibit A at 199.)

Significantly, plaintiff made a calculated decision not to amend her EEOC charge or to tell the UDC officials that her doctor had released her to light duty in February 2005, following shoulder surgery.  (Exhibit A at 208-217.)  Ms. Jones did not notify UDC at this time because she had "received … the 'Right to Sue' letter … and after that, [she] contacted a lawyer." (Exhibit A at 216-217.)   For these reasons, she said she "had no need to be in contact with UDC at that time."  (Exhibit A at 216-217.)   Thus, neither the EEOC nor UDC had notice of any allegations of discriminatory treatment that occurred after she filed her December 2003 charge of discrimination.  In fact, there is no evidence in the record whatsoever that the plaintiff contacted anyone at UDC about returning to work anytime after October 2003.

 Therefore, as the plaintiff did not include any events or dates after October 2003 in the EEOC complaint, and she did not amend her EEOC complaint to include any dates that occurred after October 2003, she simply did not exhaust administrative remedies as to any claim that may have occurred after the July 2003 through October 2003 timeframe cited in her EEOC Complaint.  Thus, Ms. Jones is precluded from enlarging the period of time in which she claims to have suffered disability discrimination as alleged in her complaint.  *Marshall, supra; Cheek, supra.*

Additionally, for public policy reasons, Ms. Jones should not be permitted to bypass the

administrative exhaustion requirement. The UDC should not be required to defend itself against claims that occurred after the July 2003 to October 2003 time period when it had no notice of such claims, and Ms. Jones did not utilize the administrative remedies mandated for any such claims. This is particularly true when Ms. Jones' written discovery responses fail to provide any notice of any claims occurring after October 2003, and in fact, there is evidence that the plaintiff chose not to contact UDC at any time in 2004 or even when she was released to light duty in February 2005. Accordingly, summary judgment should be granted in the UDC's favor on any claims occurring after October 2003 for failure to exhaust administrative remedies.

## 2. THE COURT SHOULD GRANT SUMMARY JUDGMENT IN THE UDC'S FAVOR ON PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM.

A reasonable accommodation claim is "not subject to the familiar three-part analysis of *McDonnell-Douglas Corporation v. Green, 411 U.S. 792 (1973)* 'but has its own specialized legal standards.'" *Flemmings v. Howard Univ.,* 198 F.3d 857 (D.C. Cir. 1999), *citing, Aka v. Washington Hospital Center,* 156 F.3d 1284 (D.C. Cir. 1998) (*en banc*), 156 F.3d at 1288, (citing *Barth v. Gelb,* 303 U.S. App. D.C. 211, 2 F.3d 1180, 1186 (D.C. Cir. 1993). The *Flemings* court also noted that "*Aka* adopted for ADA claims *Barth*'s thorough analysis of the applicability of *McDonnell-Douglas* … to such claims in the Rehabilitation Act context." *Flemings,* 198 F.3d at 861, *citing, Aka,* 332 U.S. App. D.C. 256, 156 F.3d 1284 at 1288, 1300-03; *Barth,* 2 F.3d at 1185-87. Accordingly, the UDC may use case law interpreting the ADA and the Rehabilitation Act interchangeably.

To establish a *prima facie* case for failure to accommodate under the ADA, a plaintiff must show: "(1) that [she] was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of [her] disability; (3) that with reasonable … accommodation [she] could perform the essential functions of the position; and (4) that the

employer refused to make such accommodations." *Bugg-Barber v. Randstad US, L.P.*, 271 F. Supp. 2d 120, *citing*, *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (*quoting Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)) (internal quotation marks omitted).[10] If the plaintiff meets her *prima facie* burden, the burden then shifts to the defendant to demonstrate a non-discriminatory reason for the adverse action, that the employee was not otherwise qualified, and that no reasonable accommodation is available or undue hardship. *Flemmings*, 198 F.3d at 861, *explaining*, *Barth*, 2 F.3d at 1186.

Here, summary judgment must be granted in the UDC's favor because Ms. Jones cannot meet her *prima facie* case. First, Ms. Jones has not demonstrated that she is disabled. Alternatively, she did not give the UDC any notice of her disability nor did she provide the UDC with any medical documentation showing any restrictions and/or limitations and, therefore, she cannot demonstrate that the UDC refused to make her any accommodation. Finally, she has not proven that she could perform the essential functions of her police officer position with or without a reasonable accommodation.

**A.    Ms. Jones is Not Disabled.**

To succeed on a claim under the ADA, a plaintiff first must prove that she was disabled within the meaning of the ADA. The Supreme Court has held that to establish a disability under the ADA, a plaintiff must show that she has an impairment that substantially limits a major life activity. *Toyota Motor Manufacturing v. Williams*, 534 U.S. 184, 195 (2002). According to the Court:

---

[10] Similarly, under the Rehabilitation Act, a plaintiff must show "(1) that he was an individual with a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Pantazes v. Jackson*, 366 F. Supp. 2d 57 (D.D.C. 2005).

"substantially limited" means "unable to perform a major life activity that the average person in the general population can perform"; or "significantly restricted as to the condition, manner or duration under which an individual can perform a major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same life activity."

*Id.* at 195-96 (quoting EEOC Regulations, 29 C.F.R. § 1630.2(j) (2001)). The Court further noted that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Id.* at 196 (citing 42 U.S.C. § 12101(a)(1)).

Moreover, it is not sufficient for the plaintiff to provide evidence that his or her disability is capable of causing such limitations. Instead, "a plaintiff must prove a substantial limit with specific evidence that *his particular* impairment substantially limits *his particular* major life activity." *Waldrip v. General Electric Co.*, 325 F.3d 652, 656 (5th Cir. 2003) (emphasis in original). The Fifth Circuit Court of Appeals explained:

The ADA requires those 'claiming the Act's protection to prove a disability by offering evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.'" *Toyota*, 534 U.S. at 198 (quoting Albertson's, 527 U.S. at 567) (alterations omitted). A plaintiff cannot survive summary judgment by showing that an impairment like his own could substantially limit a major life activity of another person or in his own future. Rather, he must show that his impairment has actually and substantially limited the major life activity on which he relies.

*Id.*

Here, the plaintiff's Amended Complaint alleges that she suffers from "chronic arthritis in her shoulder, neck and knees, bursitis in her hip, and various chronic back conditions that substantially limits one or more major life activities, including walking, standing, bending, lifting." (Amended Complaint at ¶ 8.) However, the evidence does not support that conclusion.

i.    <u>Ms. Jones does not suffer a substantial limitation of the major life activities of walking, standing, bending and lifting because she can perform the tasks central to daily life.</u>

When determining whether a plaintiff has shown a "substantial" limitation of a major life activity—such as walking, standing, bending, or lifting—"the central inquiry must be whether the claimant is unable to perform the variety of tasks central to most people's daily lives." *Toyota Motor*, 534 U.S. at 200-01. According to the Supreme Court, courts making such a determination should focus on whether a plaintiff can perform household chores and personal hygiene, because these are "the types of manual tasks of central importance to people's daily lives." *Id.* at 201.[11]

Courts also have refused to expand the scope of the ADA to include situations in which daily activities can be performed only with severe discomfort or pain. In *Weigert v. Georgetown University*, 120 F. Supp. 2d 1, 10-11 (D.D.C. 2000), this Court held that a plaintiff's discomfort with the glare from fluorescent lights, sunlight, and other bright lights did not constitute a substantial limitation of a major life activity. The Court adopted reasoning set forth in *Lajaunie v. Hibernia Corp.*, 2000 U.S. Dist. LEXIS 1209 (E.D. La. Feb. 8, 2000), explaining that, the *Lajuanie* plaintiff:

---

[11] *See Black v. Roadway Express, Inc.* 297 F.2d 445, 450 (6th Cir. 2002) ("alleged inability to perform certain tasks or functions on a repeated or prolonged basis is not enough, as a matter of law, for him to meet the threshold requirement of proving that he is 'disabled.'"). *See id.* at 451 ("[m]oderate difficulty or pain experienced while walking does not rise to the level of a disability."). *See also Marinelli v. City of Erie* 216 F.2d 354, 362 (3rd Cir. 2000) (concluding that an inability to perform household chores does not satisfy the rigid standards for an ADA disability); *see also Toyota Motor*, 534 U.S. at 200-01 (holding that plaintiff had not established an ADA-protected disability as a matter of law because she "could still brush her teeth, wash her face, bathe, tend to her flower garden, fix breakfast, do laundry, and pick up around the house"); *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir. 1999) (holding that plaintiff could not establish an ADA-protected disability based on his inability to shovel snow, garden, and mow his lawn); *Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1025 (5th Cir. 1999) (holding that plaintiff could not establish ADA-protected "walking" disability based on her claim that she "walks with a limp and moves at a significantly slower pace than the average person" and that extreme cold exacerbates these conditions).

was not materially hampered in the performance of life activities under circumstances similar to the plaintiff's.  In *Lajaunie*, the plaintiff was diagnosed with corneal disease, which gave her problems with glare.  The court determined that she was neither substantially limited nor materially hampered, although it was clear that because of the glare "she [could] no longer work in the garden, ride a bicycle and do crossword puzzles."  2000 U.S. Dist. LEXIS 1209, *18.  The court relied on the plaintiff's doctor's report, which stated that the plaintiff's condition did not cause "ocular damage," notwithstanding the fact that her condition "could be extremely uncomfortable and quite distracting."  *Id.*  In dismissing her claims, the court held that to find that the plaintiff  was "substantially limited" would dilute the meaning of "substantially limited" to simply "limited."  *See id.*

*Weigert v. Georgetown University*, 120 F. Supp. 2d, at 11.

Here, Ms. Jones' own testimony shows that she did not suffer a substantial limitation of a major life activity.  While the UDC does not dispute that Ms. Jones experienced pain in 2003, there is no evidence that her alleged impairments prevented her from conducting those activities that have been deemed "of central importance to people's daily lives."  *Toyota Motor*, 534 U.S. at 201.

Ms. Jones admitted in her deposition that she was able to "shower," "brush [her] teeth," "fix breakfast," "look at tv," "read the newspaper," (Exhibit A at 170-73.)  She could also do "physical therapy" approximately two or three times a week for about 30 minutes.  (Exhibit A at 174.)  She described physical therapy at that time as including "leg lifts," and "a variety of exercises," including attaching a device to her doorknob and pulling it.  (Exhibit A at 173-74.)  Also in July 2003, she would take walks with her husband.  (Exhibit A at 176-77.)   In fact, Dr. Omohundro, M.D., stated that Ms. Jones could walk and stand for two hours a day.  (Exhibit H.)

Simply put, Ms. Jones has not alleged any substantial limitation of a major life activity.  She can and does perform those tasks central to daily life without substantial limitation.  Moreover, there is no evidence that any of her injuries has a "permanent or long-term impact," which is a permissible factor for determining whether Ms. Jones is substantially limited in a

major life activity.  *Toyota*, 534 U.S. at 195, *citing*, 29 CFR § 1630.2(j)(2)(i)-(iii).  She therefore

is not disabled under the meaning of the ADA and does not qualify for its protections.

> **B.    There is No Evidence That Ms. Jones Gave Any UDC Official Any Notice Of Her Disability or Provide Any Medical Documentation in July 2003, October 2003 or thereafter.**

Even if the Court determines that Ms. Jones is disabled, summary judgment should be

granted in UDC's favor because Ms. Jones neither gave the UDC any notice of her disability

and/or restrictions nor did she provide any medical documentation to the UDC in July 2003,

October 2003 or thereafter.

> i.    <u>During the July 2003 and October 2003 Telephone Conversations with UDC staff, the Plaintiff Did not Tell the UDC of Her Alleged Disability.</u>

The plaintiff has the burden of demonstrating that she gave UDC notice of her disability

and when she was allegedly requesting an accommodation in July 2003 and October 2003.  *See*

*Heasley v. D.C. Gen. Hosp*., 180 F. Supp. 2d 158, 167 (D.D.C. 2002), *citing*, *Weigert v.*

*Georgetown Univ* ., 120 F. Supp. 2d 1, 7 (D.D.C. 2000) (granting summary judgment to the

defendant employer because the plaintiff could not "carry her 'burden of establishing with

medical evidence the existence of the alleged disability, and presenting the documentation during

the term of employment, not following termination.'").  *See also Evans v. Davis Mem. Goodwill*

*Indus.,* 133 F. Supp. 2d 24, 27 (D.D.C. 2000) ("Employers can only be held liable for

discriminating on the basis of 'known disabilities.' The disabled employee typically has the

burden of providing notice of the disability and the limitations it imposes.").  *See also Crandall*

*v. Paralyzed Veterans of Am.,* 1997 U.S. Dist. LEXIS 7921 *11 (internal citations omitted) ("The

great weight of precedent requires that the employer have knowledge of the employee's disability

to prove a violation of an antidiscimination statute.").

Even taking the facts in the light most favorable to Ms. Jones, this Court cannot conclude

that, during the brief July 2003 and October 2003 telephone conversations with UDC officials, she gave UDC *any* notice of her disability or of any restrictions or limitations on her ability to return to work.

Moreover, this Court should conclude that the plaintiff did not contact the UDC in 2004. For instance, Ms. Jones denied contacting Lt. Morton, Lt. Adams, Lt. Medley or Mr. Robinson in 2004 to come back to work:

> Q    In 2004, did you ever make contact with Morton or Robinson or Medley
>       or Adams at UDC to try and come back to work?
>
> A    2004? Not to my recollection.

(Exhibit A at 199.)  Moreover, Ms. Jones made a calculated decision *not* to inform the UDC in February 2005 that she was released to return to work because she already had contacted a lawyer.  (Exhibit A at 216-217.)

Accordingly, the Court should grant summary judgment in the UDC's favor on plaintiff's reasonable accommodation claim because she did not inform the UDC during any alleged telephone conversation in July 2003 or October 2003 that she had a disability or that there were any restrictions or limitations on her return to work.  Moreover, the plaintiff conceded that she did not contact the UDC in 2004 or in February 2005.  Accordingly, "without sufficient notice of a qualifying disability, defendants were under no obligation to provide an accommodation…" *Heasley*, 180 F. Supp. 2d at 167.  In the absence of any such notice, the Court should grant summary judgment in the UDC's favor.

> ii.    The plaintiff did not provide any medical documentation to the UDC verifying her
>        alleged request for an accommodation in July 2003, October 2003 or anytime
>        thereafter.

Alternatively, the plaintiff's reasonable accommodation claim cannot survive summary judgment because she did not provide her employer with any medical documentation certifying

her need for an accommodation in July 2003 or October 2003.  This "notice" requirement cannot be satisfied by the plaintiff's own self-serving statements.  "A person alleging a disability protected by the ADA has a burden of establishing with medical evidence the existence of the alleged disability, and presenting the documentation during the term of employment, not [after]."  *See Kalekiristos v. CTS Hotel Mgmt. Corp.*, 958 F. Supp. 641, 657 (D.D.C. 1997); *Aritha Byrd v. District of Columbia*, Civil Action No. 02-1870 (RMU), September 13, 2004, Memorandum Opinion at 12.

Moreover, an employer has the right to require an employee to provide medical documentation that indicates that the plaintiff suffers from a disability and requires accommodation.  *Flemmings*, 198 F.3d at 861-62; *Haynes v. Williams*, 279 F. Supp. 2d 1, 10-11 (D.D.C. 2003); *Heasley.*, 180 F. Supp. 2d at 163-64, 167 (holding that doctor's note, which "indicated that [plaintiff] had received medical treatment but offered no diagnosis or prognosis regarding her ability to work," did not put the employer on notice of a disability requiring accommodation under the ADA); *Evans v. Davis Mem. Goodwill Indus.*, 133 F. Supp. 2d 24, 27 (D.D.C. 2000) (internal citations omitted) ("notice under the ADA need not be precise, but it must put the employer sufficiently on notice of the existence and nature of the disability. … Nor can an employer assume that an employee with a disability suffers from a limitation.  Rather, the employee must indicate not only a disability, *but also any job-related limitation stemming from that disability.*")).

Indeed, the Collective Bargaining Agreement memorializes the requirement for police officers to provide UDC officials with medical documents showing that an employee has a

limitation.[12]  In fact, Ms. Jones admitted receiving a copy of the Collective Bargaining

Agreement, which clearly requires her to submit medical documentation if she is requesting an

accommodation for health reasons.  (Exhibit A at 58.)  Even if the Court makes all inferences in

Ms. Jones' favor, she was still aware of her *independent* obligation to provide medical

documentation, per the Collective Bargaining Agreement.  Her complete failure to provide any

medical documentation to support her alleged request for an accommodation in July 2003 and

October 2003 is fatal to her claim.  In fact, she conceded that from July 2003 and up to the

present, she never provided *any* medical documentation to any UDC official relating to any

restrictions or limitations on her ability to return to work, which buttresses the University's claim

that it had no notice of Ms. Jones' limitations:

> Q     Did you ever produce any documentation from a doctor about your
>       restrictions on your duties at any time to the university from July 2003 to
>       the present?
>
> A     From 2003 until—
>
> Q     From July 2003 to the present.
>
> A     No, not to my recollection.
>
> Q     Did you ask anyone to fax or mail or hand-deliver any documentation
>       from any doctor about your restrictions from to the university from July
>       2003 to the present?

---

[12] There are also important public policy reasons for requiring a formal, written request to support a
request for an accommodation.  In *Edwards v. United States EPA*, 456 F. Supp. 2d 72 (D.D.C. 2006), the
Court granted summary judgment in the employer's favor on the plaintiff's reasonable accommodation
claim because the "plaintiff never requested an accommodation [for a Flexiplace policy] that was denied."
*Id.* at 103.  The Court concluded that "an employee's oral request cannot trump an employer's established
procedure for requesting and approving disability accommodations… [because if] a disabled employee
could circumvent those [formalized] procedures simply by making an unverifiable oral request for the
same accommodation, then the employer would have no way of knowing which employees were working
at home with proper authorization and which ones were simply absent. A one-time decision by an
individual supervisor would effectively bind an employer that normally prefers for such decisions to be
made as part of a centralized process."  *Id.* at 103.

A       Not to my recollection.

(Exhibit A at 152.)  Accordingly, the Court should grant summary judgment in UDC's favor

because the plaintiff failed to provide any medical documentation to any UDC official in July

2003, October 2003, or thereafter.

### C.    Alternatively, Ms. Jones Was Not a "Qualified Individual" Under the ADA Because She Could Not Perform the Essential Functions of a UDC Police Officer Position With or Without a Reasonable Accommodation.

Even if the Court finds that the plaintiff was disabled in July 2003 and that she provided

the UDC with proper notice of her disability and medical documentation between July 2003 and

October 2003, those facts alone do not entitle the plaintiff to recovery.  Rather, a disabled

employee is entitled to ADA protection only if he or she is a "qualified individual" under the

ADA.  To demonstrate that she is a "qualified individual with a disability," the plaintiff must

show that a reasonable jury could find that she could perform, with or without reasonable

accommodation, the "essential functions" of her job that she holds or desires.  42 U.S.C. §

12111(8).  In "accord with this definition, handicap discrimination laws protect only those who

can do their job in spite of their handicap, not those who could do it but for their handicap."

*Fields v. Lyng*, 705 F. Supp. 1134, 1136 (D.D.C. 1995) (citing *Southeastern Community College

v. Davis*, 442 U.S. 397, 406 (1979)).

Relevant to the issues presented herein, the UDC acknowledges that a reasonable

accommodation may include:

> … job restructuring, part-time or modified work schedules, reassignment to a
> vacant position, acquisition or modification of equipment or devices, appropriate
> adjustment or modifications of examinations, training materials or policies, the
> provision of qualified readers or interpreters, and other similar accommodations
> for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

Moreover, discretion is given to the employer to determine what job functions are essential. *See* 42 U.S.C. § 12111 ("… consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.").

     i.     The UDC Has Identified the Essential Functions of a Police Officer.

The UDC has identified the essential functions of the police officer position through the two position descriptions relevant to the time period of July 2003 through October 2003. The first position description is dated December 19, 1995 and the second position description, which is signed by Mr. Robinson, is dated September 15, 2003. Both are attached hereto as Exhibit D.

     ii.     Ms. Jones essentially conceded that she could not perform the essential functions of a police officer position without a reasonable accommodation.

Ms. Jones essentially concedes that she can not perform the essential functions of her position as a UDC police officer. First, she is clearly limited in her ability to perform the patrol functions of the police officer position. Although Ms. Jones testified that in July 2003 she was able to conduct periodic inspections and patrols, patrol some traffic and write some tickets and incident reports for 2 hours, she conceded that she was not physically able to apprehend suspects or perform her other patrol duties during her entire, 8-hour shift, as required by her job. (*See* Exhibit D (1995 Position Description); Exhibit A at 161-62, 164-65.)

In addition, she was taking pain medication that, by her own admission, made her groggy. Moreover, she continued to have frequent and sometimes-debilitating anxiety attacks. These drugs and anxiety attacks may impair Ms. Jones' judgment to carry out her law enforcement activities. (*See* Exhibit D.) Because of this medication, which warned that she should not "operate machinery," she could not operate the golf cart to survey the campus buildings, as

required by her job.  (*See* Exhibit D; Exhibit A at 177.)

Ms. Jones is not able to perform the essential public safety functions of her police officer position.  Even though the police officer position required her to be able to care for and use a firearm, Ms. Jones has not carried her firearm since December 1999 because of her injuries. (Exhibit A at 19; 38-39.)  Furthermore, Ms. Jones said that if she had to run after a fleeing suspect, she would not "get too far."  (Exhibit A at 81.)  For these reasons, it is apparent that Ms. Jones could not perform the essential functions of the police officer position without any accommodation.

> iii.     Ms. Jones has not demonstrated that she can perform the essential functions of the UDC police officer with a reasonable accommodation.

Ms. Jones appears to suggest two options for a reasonable accommodation.  First, she proffered that two UDC police officers had received an accommodation.  Second, she testified that, in the past, she was permitted a seemingly indefinite assignment, which involved limited patrolling and communications work.  However, Ms. Jones has not demonstrated that either of these accommodations would enable her to perform the essential functions of the police officer position.

First, the accommodations given to the two officers were temporary, two-week accommodations.  Ms. Jones' case is also distinguishable from these two officers because each officer provided UDC with supporting medical documents, as required by the collective bargaining agreement.   Ms. Jones has not demonstrated that after a comparable two-week accommodation, she would be able to perform the essential functions of the police officer position.

Second, Ms. Jones' "indefinite" limited patrol/communications assignment is not an otherwise viable accommodation.  The UDC is not required to create a permanent

accommodation for Ms. Jones like she claimed she had been given in the past. *See Long v. Howard University*, 439 F.Supp. 2d 68, 76 (D.D.C. 2006) ("past practice alone, while probative of reasonableness, is not dispositive"); *Brooks v. City of Wichita*, 2006 U.S. Dist. LEXIS 40926, citing, *Martin v. Kansas*, 190 F.3d 1120, 1133 (10th Cir. 1999) ("The Tenth Circuit has held that an employer has no duty under the ADA to create a permanent light duty position when the position had previously been a temporary accommodation.); *Davis v. Heraeus Electro-Nite Co.*, 2002 U.S. Dist. LEXIS 16268  *13 (E.D. Pa. 2002) (internal citations omitted) ("The ADA does not mandate that the employer create a 'light duty' or new permanent position.").

Finally, Ms. Jones has not demonstrated that she could perform the essential functions of the police officer position even *with* the indefinite limited patrol/communications assignment. Notably, the UDC communications specialist position is an entirely different position than the UDC police officer position and has different duties and required knowledge.  (*See* Exhibit O.) Moreover, by definition, a *limited* patrolling assignment means that Ms. Jones could only perform – at best – the essential functions of her position for a *limited* time.  There is still no evidence that she could qualify for, let alone carry and use, a firearm, apprehend suspects or otherwise satisfy the physical demands of the police officer position.  Accordingly, the Court should grant summary judgment in the UDC's favor because the plaintiff has not satisfied her *prima facie* burden under the ADA and the Rehabilitation Act.

WHEREFORE, the Court should grant summary judgment in the UDC's favor for the reasons described herein on Ms. Jones' Amended Complaint.

Respectfully submitted,

LINDA SINGER
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division


_____/s/_____
PHILLIP A. LATTIMORE, III [422968]
Section Chief
General Litigation Section III



_____/s/_____
DANA K. DELORENZO [468306]
Assistant Attorney General
Sixth Floor South
441 4th Street, N.W.
Washington, D.C. 20001
(202) 724-6515
(202) 727-3625 (fax)
E-Mail: dana.delorenzo@dc.gov

# UNITED STATES DISTRICT COURT FOR

# THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Valerie Jones, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1187 (RMU) |
| | ) | |
| University of the District of Columbia | ) | |
|     Board of Trustees, | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Fed. R. Civ. P. 56, the defendant herein submits the following material facts to which there is no dispute:

1. Ms. Jones was hired in 1988 at UDC as a police officer. (Exhibit A at 11-12.)

2. Ms. Jones received a copy of the Collective Bargaining Agreement ("CBA") after she was hired by the UDC. (Exhibit A at 58.)

3. Paragraphs 7.9 and 7.10 of the Agreement require an employee to submit medical documentation to the university when requesting an accommodation for health reasons. (Exhibit A at 59.)

4. The police officer position is physically demanding. "Officers have to patrol all area aspect[s] of the campus," which is comprised of "25 acres," including "11 buildings," "three parking garages" and "five surface parking lots." (Exhibit C at 49-50.)

5. Police officers patrol interior and exterior areas of all campus buildings, they patrol the entire campus, direct traffic, issue tickets, respond to incident reports and they work communications and other special events (*e.g.*, dances and registration). (Exhibit A at

12-13, 17.)

6. The 1995 UDC police officer position description requires "periodic patrols and inspections of buildings" to "check and secure exterior building entrances; to detect and apprehend unauthorized personnel," "take[] immediate steps to apprehend and arrest those who are responsible for the incident and to protect all occupants within the confines of the facility from physical harm." (Exhibit D.)

7. The 1995 UDC police officer position requires "[d]emonstrated ability to use firearms in a safe manner, and skill in their use." (Exhibit D.)

8. The 1995 UDC police officer position requires an "[a]bility to meet and deal with a wide range of persons in stress situations" and an "[a]bility to exercise arrest authority and work under hazardous conditions." (Exhibit D.)

9. The 1995 UDC police officer position requires "[w]alking, climbing, driving, running, etc." (Exhibit D.)

10. The 2003 UDC police officer position requires enforcing policies, procedures and protocols, respond to alarms, conduction investigations, responding to "unusual, suspicious, criminal, and non-criminal activity…" (Exhibit D.)

11. The 2003 UDC police officer position requires good decisionmaking skills "particularly under stressful conditions." (Exhibit D.)

12. The 2003 UDC police officer position requires "[p]roficiency in the care and use of firearms. (Exhibit D.)

13. The 2003 UDC police officer position requires "[s]tanding for extended periods, walking, running, bending, climbing (stairs), driving, and other flexibility associated with affecting police related actions. (Exhibit D.)

14. Ms. Jones used to carry a firearm as part of her responsibility as a police officer for the UDC. (Exhibit A at 19.) Also at times, Ms. Jones operated a golf cart in order to conduct surveillance of University grounds. (Exhibit A at 83.)

15. On November 14, 2002, Ms. Jones sustained a work-related injury. (Exhibit A at 98-99.)

16. As a result of this incident, Ms. Jones was prescribed pain medication, used pain patches and received cortisone injections but the "pain never went away." (Exhibit A at 108.) Ms. Jones also attended physical therapy for "a few months." (Exhibit A at 108-09.)

17. Since 1999, Ms. Jones suffered anxiety attacks. (Exhibit A at 332.) The frequency of Ms. Jones' anxiety attacks varied from "two/three times out of the week" to a "week or two" without an attack. (Exhibit A at 334.) Ms. Jones has "no idea" what triggers her attacks because "they come on when [she's] calm or if [she] is upset…" (Exhibit A at 334-335.) To calm these anxiety attacks, Ms. Jones is currently taking generic Zoloft. (Exhibit A at 336.)

18. From November 2002 to January 2003, Ms. Jones continued to suffer anxiety attacks. (Exhibit A at 333-34.) In fact, she alleges to have suffered an anxiety attack as the result of a telephone conversation with Lt. Morton, her UDC supervisor, about his failure to submit paperwork so she could get her worker's compensation payments. (Exhibit A at 333.)

19. On March 14, 2003, then-Captain Morton wrote a memorandum in response to a call he received from Yvonne Chandler, a UDC HR benefits employee who inquired whether there were any light duty positions available for Ms. Jones. (Exhibit F at 11.) The Memorandum reads: "This memorandum is to inform you that Officer Valerie Jones is requesting light duty from the Office of University Police. At this time we do not have

light duty assignment available for Ms. Jones."  (Exhibit G.)

20. On July 2, 2003, some eight months after the plaintiff went out on worker's

compensation, Ms. Jones' doctor, Phillip H. Omohundro, M.D., wrote her a note and

released her to "light duty" with restrictions.  (Exhibit H.)  Ms. Jones was restricted to

only walk and stand for 2 hours out of an 8-hour day.  (Exhibit H.)  She was not allowed

to lift or carry.  (Exhibit H.)  The July 2, 2003 doctor's note indicated that Ms. Jones

should be re-evaluated in four weeks.  (Exhibit H.)

21. Although Ms. Jones testified that in July 2003, she was able to conduct periodic

inspections and patrols, patrol some traffic, and write some tickets and incident reports of

these tasks for 2 hours, she conceded that she was not physically able to apprehend

suspects or perform other patrol duties during her entire, 8-hour shift.  (Exhibit A at 161-

62, 164-65.)  Ms. Jones said that if she had to run after a fleeing suspect, she would not

"get too far."  (Exhibit A at 81.)  In July 2003, Ms. Jones did not drive because she was

on medication that said "do not operate machinery."  (Exhibit A at 177.)  Even though the

police officer position required her to be able to care for and use a firearm, Ms. Jones has

not carried her firearm since December 1999 because of her injury.  (Exhibit A at 19; 38-

39.)

22. In July 2003, Ms. Jones spoke to Lt. Glenn Adams, Lt. Morton, and finally, Mr.

Robinson, the Vice President of the Department of Public Safety and Emergency

Services.  She informed them that she "was released from [her] doctor to come back to

work in a light duty status, and that [she] had … documents from [her] doctor."  (Exhibit

A at 124.)  According to Ms. Jones, Lt. Morton directed her to contact Mr. Robinson

because "a letter had come out in reference to no more light duty being available for the

18

department." (Exhibit A at 125.)

23. Mr. Morton has no recollection of any July 2003 conversation with the plaintiff. (Exhibit F at 10-11.)

24. Even though Ms. Jones alleges that Mr. Robinson informed her that "there was no light duty available," Mr. Robinson testified under oath that he informed the plaintiff in July 2003 that "she should … bring me some doctor's certification to let me know her limitations and so forth." (Exhibit A at 133; Exhibit C at 6.) According to Mr. Robinson, Ms. Jones did not tell him about her restrictions. (Exhibit C at 6-7.)

25. During her July 2003 conversation with Mr. Robinson, Ms. Jones told Mr. Robinson that she was on medication "for pain, for spasms" and that some of the medications that she was taking made her "groggy" and "unbalanced." (Exhibit A at 133, 135; Exhibit C at 7.) During this conversation, Mr. Robinson allegedly informed Ms. Jones, a police officer whose position required her to carry a firearm, that she "would be a threat to the university and to the students because of [her] condition..." (Exhibit A at 134.)

26. Mr. Robinson did not have any further conversations with Ms. Jones about coming back to work at UDC. (Exhibit C at 7.)

27. The plaintiff did *not* give any UDC official a copy of Dr. Omohundro's July 2, 2003 doctor's note. (Exhibit A at 145-46; footnote 1, *supra*.) No other evidence has been produced in discovery that demonstrates that any UDC official had knowledge of the contents of Dr. Omohundro's July 2, 2003 note. (Record, generally.)

28. On July 24, 2003, Ms. Jones left a telephone message for a different doctor, Andrew Lee, to request a "letter stating her medical conditions … to her job." (Exhibit I.) She also stated she was "having anxiety attacks" and requested "ativan." (Exhibit I.)

29. No UDC official heard from Ms. Jones in August 2003 and September 2003.

30. Even though Mr. Morton does not recall the conversation, Ms. Jones asserts to have spoken to him in October 2003, almost one year after her injury. (Exhibit A at 200.) She told him "everything was still the same." (Exhibit A at 200.)

31. In 2003, Ms. Jones was in pain "on a daily basis." (Exhibit A at 167.) The "severe" pain was in her "shoulder, from the neck down to the lower back, both knees [and] the right hip." (Exhibit A at 168.) Sometimes, Ms. Jones would use a cane to get up and down from a sofa, bed or chair. (Exhibit A at 188.)

32. In 2003, Ms. Jones was able to "shower," "brush [her] teeth," "fix breakfast," "look at tv," "read the newspaper," (Exhibit A at 170-73.) She would also participate in "physical therapy" approximately two or three times a week for about 30 minutes. (Exhibit A at 174.) She described physical therapy at that time as including "leg lifts," and "a variety of exercises," including attaching a device to her doorknob and pulling it. (Exhibit A at 173-74.) Also in July 2003, she would take walks with her husband. (Exhibit A at 176-77.)

33. Ms. Jones filed an EEOC Charge of Discrimination on December 17, 2003. (Exhibit J.) In her EEOC Charge, she only identified dates in July 2003 and October 2003 as the timeline of her contacts with UDC officials. (Exhibit J.)

34. The plaintiff did not amend her EEOC Complaint. (Exhibit A at 121-22.)

35. Ms. Jones never contacted Lt. Morton, Lt. Adams, Lt. Medley or Mr. Robinson in 2004 to come back to work. (Exhibit A at 199.)

36. On October 21, 2004, almost one year after she filed her EEOC complaint, Ms. Jones had surgery on her right shoulder. (Exhibit A at 208.) She remained out on worker's

compensation until February 15, 2005, when Dr. Omohundro again released her to "light

duty."  (February 15, 2005 note attached hereto as Exhibit K; Exhibit A at 212-213.)  Ms.

Jones never gave this doctor's note to any UDC official because she had "received … the

'Right to Sue' letter … and after that, [she] contacted a lawyer."  (Exhibit A at 216-217.)

For these reasons, she said she "had no need to be in contact with UDC at that time."

(Exhibit A at 216-217.)

37. From July 2003, and up to the present, Ms. Jones never provided *any* medical

documentation to any UDC official relating to any restrictions or limitations on her

ability to return to work.  (Exhibit A at 152.)

38. Ms. Jones' Amended Complaint does not allege an adverse employment action.

<div style="margin-left: 40%;">

Respectfully submitted,

LINDA SINGER
Acting Attorney General for the District of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

_____/s/_____
PHILLIP A. LATTIMORE, III [422968]
Section Chief
General Litigation Section III

_____/s/_____
DANA K. DELORENZO [468306]
Assistant Attorney General
Sixth Floor South
441 4th Street, N.W.
Washington, D.C. 20001
(202) 724-6515
(202) 727-3625 (fax)
E-Mail: dana.delorenzo@dc.gov

</div>

**UNITED STATES DISTRICT COURT FOR**
**THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Valerie Jones,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 05-1187 (RMU)** |
| | ) | |
| **University of the District of Columbia** | ) | |
| **Board of Trustees,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Based on the defendant's Motion for Summary Judgment, Memorandum of Points and

Authorities and Statement of Undisputed Facts, and any opposition thereto, is it this _____ day of

February, 2007, hereby

ORDERED that the defendant's Motion is GRANTED; and it is

FURTHER ORDERED that summary judgment is granted in defendant's favor.  The

plaintiff's Amended Complaint is DISMISSED WITH PREJUDICE.


_____
The Honorable Ricardo M. Urbina
United States District Court Judge