UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Valerie Jones,<br><br>    Plaintiff.<br><br>v.<br><br>University of the District of Columbia<br>    Board of Trustees,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Civil Action No. 05-1187 (RMU)<br>)<br>)<br>)<br>)<br>)<br>) |

## SWORN DECLARATION OF VALERIE JONES

Pursuant to 28 U.S.C. Section 1746, I, Valerie Jones, declare as follows:

1. I am an adult citizen of the U.S., am competent to testify to the matters in this Declaration, and have personal knowledge of the facts set forth herein.

2. I am the plaintiff in this case and submit this declaration in support of my opposition to Defendant's Motion for Summary Judgment.

3. On September 28, 2004, the U.S. Equal Employment Opportunity Commission ("EEOC") issued a determination letter finding that the University of the District of Columbia ("UDC") had violated the Americans With Disabilities Act when it denied me a reasonable accommodation that met my medical restrictions and instead told me that I would not be allowed to return to work without a full medical release (**Exhibit 1**, Determination letter).

4. I was hired by UDC in 1988 as a police officer.

5. The EEOC found that I am disabled within the meaning of the Americans with Disabilities Act and the Rehabilitation Act because I suffer from chronic arthritis in my shoulder, neck and knees, bursitis in my hip, and various chronic back conditions. I

have pain and spasms when walking, sitting, bending, and lifting. I cannot reach above my right shoulder level without pain. When I try to kneel, I fall face down. I have anxiety attacks. My left and right knees give out sometimes. My left knee causes me a great deal of pain on a daily basis. I have difficulty climbing steps. I have spasms in my right shoulder, lower back, neck and knees. I also have arthritis in my left hand which affects my writing. My doctor has placed restrictions on the amount of time I can spend walking or standing. I am not allowed to do any lifting or carrying. My disabilities substantially limit one or more of my major life activities including walking, standing, bending, lifting, reaching. I have been in pain since December 17, 1999. I depend on my spouse to assist me with my personal care depending on the severity of my pain. My disability is permanent.

6. I have sustained three separate injuries while working for defendant. On December 17, 1999, I was assaulted by a male coworker. I suffered multiple injuries including a rotator cuff tear to my right shoulder.

7. In April 2001, the male coworker who assaulted me in 1999 followed me onto an elevator despite a restraining order against him preventing him from having any contact with me. I had an anxiety attack and I fainted. I fell and landed on concrete. I suffered multiple injuries. My shoulder and back were reinjured by the fall.

8. On November 14, 2002, I was detailed by my supervisor to escort a contractor to the roof top of buildings 32-42. When I went to step down on a concrete barrier I fell and sustained multiple injuries to my right shoulder, back, knees and right hip.

9. I received workers' compensation for each of these injuries.

10. Following my injuries in 1999 and 2001, UDC accommodated my disabilities by allowing me to work light duty. I did limited patrolling by foot and vehicle, issued notices of parking infractions, performed traffic details, escorted staff and students to and from their vehicles, responded to incidents, assisted coworkers with incidents, answered telephones, prepared incident reports, evaluated police equipment, worked in the registration area, and worked in communications.

11. While I was working light duty I completed law enforcement training programs and received a certificate of appreciation for my contribution to the Martin Luther King Celebration (**Exhibit 2**).

12. I did not carry a firearm at work after the assault in 1999.

13. I was on light duty at the time of my injury on November 14, 2002.

14. The procedure for requesting light duty at UDC was as follows: If an officer was out on sick leave and could go back to work under restrictions, the officer would call her immediate supervisor, advise the supervisor that she was able to come back to work light duty and go over the doctor's restrictions with the supervisor. After the officer returned to work, she would give the doctor's note to her supervisor.

15. I followed this procedure when I returned to work on light duty following the assault in 1999 and the fall in 2001.

16. In February 2003, while I was recovering from the November 2002 injury, my doctor recommended that I have gastric bypass surgery.

17. On February 24, 2003, I requested advance leave of 240 hours so that I could undergo gastric bypass surgery on February 27, 2003. (**Exhibit 3**, Memorandum from Jones to Capt. Morton dated February 24, 2003).

18. I did not speak to anyone at UDC about returning to work or needing to work light duty until July 2003.

19. The EEOC found that I was released to work with restrictions beginning on or around July 2, 2003 (**Exhibit 1**, Determination letter).

20. In or about July 2003, my physician, Phillip H. Omohundro, M.D., advised me that I could return to work light duty as of July 3, 2003. (**Exhibit 4**, July 2, 2003 note from Dr. Omohundro).

21. Dr. Omohundro stated in his notes from my office visit on July 2, 2003, that I could not walk or stand more than two hours intermittently in an eight hour day and that I could do no lifting or carrying (**Exhibit 5**, Dr. Omohundro's dictated notes, July 2, 2003).

22. The EEOC found that when I called UDC to say that I could return on light duty status, I was told there were no light duty assignments available and that there never had been light duty assignments within the University Police Department. The EEOC also found that Mr. Robinson told me that I could not return to work without a full release (**Exhibit 1**, Determination letter). The facts underlying this finding are as follows:

23. In early July, 2003, I called Lt. Glenn Adams and advised him that I could return to work light duty. Lt. Adams handed the telephone to Lt. Morton who told me that I needed to call UDC Vice President of Public Safety and Emergency Management, Robert T. Robinson. Lt. Morton said that a notice came out that there was no light duty and that he gave the notice to human resources (**Exhibit 6**, Letter from Lt Adams).

4

24. I called Mr. Robinson and told him I had been released to work light duty and I explained what my doctor had stated in his note regarding my restrictions. Mr. Robinson told me that there was no light duty available, that there never had been light duty and that documents indicating that I could work light duty were unacceptable. Mr. Robinson stated that I could not return to work unless I had no medical restrictions.

25. Mr. Robinson told me that I had to go back to my doctor and get a note stating that I could work without restrictions and without medications.

26. Mr. Robinson told me that if I returned to work with medical restrictions, I would put the university and the staff at risk.

27. Mr. Robinson told me that he checked personnel files and that there had never been any light duty work for police officers.

28. After speaking with Mr. Robinson, I contacted human resources and spoke to Ms. Yvonne Chandler about the light duty notice. She said that I needed to go back to my department because the notice came from my department. I called Lt. Morton again and he told me that he would hand carry the notice to personnel.

29. In or about September or October 2003, my workers compensation claims adjuster sent me a copy of a memorandum purportedly written by Lt. Morton on March 14, 2003. The memorandum states that I had requested light duty and that there were no light duty assignments available for me. Although the memorandum is dated March 14, 2003, I believe this date is incorrect. In March 2003, I was recovering from the gastric bypass surgery that I had on February 27, 2003 and I was unable to come back to work at that time. In addition, the top of the document shows that it was faxed

from the UDC Personnel Office on July 28, 2003 (**Exhibit 7**, Memorandum from Phillip Morton).

30. Neither Lt. Morton nor Mr. Robinson nor anyone else at UDC, asked me to provide a doctor's note or certificate regarding my medical restrictions or told me that I needed to provide a doctor's note before UDC would consider granting me a reasonable accommodation. UDC gave me no opportunity to provide documentation concerning my medical restrictions.

31. In August and September 2003, I spoke to several officials at UDC including Mr. Robinson, Lt. Morton, Lt. Adams, Lt. Medley and Communications Officer Virgil Royal concerning my request for light duty. UDC continued to deny my request.

32. In October 2003, I again contacted Lt. Morton and he told me that there was no light duty available.

33. Dr. Omohundro sent his note releasing me to work light duty to workers' compensation officials. Rehabilitation officials contacted UDC regarding returning me to work on light duty status.

34. In July 2003, the job of a police officer at UDC included patrolling, issuing notices of parking infractions, performing traffic details, assisting other officers with incidents, and working in communications (**Exhibit 8**, Robinson depo. p. 10-11).

35. In July 2003 I could have performed my former job with the medical restrictions required by my health care provider in his July 2, 2003 note. For example, I could have performed limited patrolling by foot and vehicle, issued notices of parking infractions, performed traffic details, escorted staff and students to and from their vehicles, responded to incidents, assisted coworkers with incidents, answered

telephones, prepared incident reports, evaluated police equipment, worked in the registration area, and worked in communications.

36. The EEOC found that I contacted UDC again in 2004 and attempted to provide doctors notes which allowed for my release with medical restrictions, but that UDC continued to deny me reinstatement (**Exhibit 1**, Determination letter).

37. In August 2004, I again contacted Lt. Adams and Lt. Medley regarding the possibility of returning to work light duty. They told me that there was no light duty available.

38. The EEOC found that UDC failed to provide me with a reasonable accommodation as required by the ADA. The EEOC also found that UDC refused to enter into the interactive process of providing me with an accommodation (**Exhibit 1**, Determination letter).

39. The EEOC found that I would have provided medical records to UDC had UDC properly entered into the interactive process instead of rejecting my attempts to provide medical documentation and return to work (**Exhibit 1**, Determination letter).

40. The EEOC found that UDC provides light duty assignments to other officers (**Exhibit 1**, Determination letter).

41. At the time UDC denied my requests for accommodations, it was permitting other officers to work light duty. (**Exhibit 9**, Morton Depo., p. 13-15; **Exhibit 8**, Robinson Depo., p. 11-19).

42. UDC permitted other officers to work light duty for extended periods of time. (**Exhibit 10**, Letter from Officer Charles Smith).

43. In his September 15, 2006 report, my physician, Phillip H. Omohundro, M.D., stated that I remain released to a sedentary work position and that this should be made

permanent. (**Exhibit 11**, Report from Dr. Omohundro dated September 15, 2006).

44. I have been without a paycheck from Defendant since 2002.

Under penalty of perjury, I declare pursuant to 28 U.S.C. Section 1746 that the foregoing is true and correct.

Executed this 26th day of March, 2007.

*Valerie S. Jones*
Valerie Jones